# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KIMBERLY A. CASE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 04 C 3650 |
| ) | Judge Joan H. Lefkow |
| MIDWESTERN SPORTS MEDICINE & ) | |
| ORTHOPAEDIC SURGICAL ) | |
| SPECIALISTS, LTD., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly A. Case ("Case") filed this lawsuit against her former employer, Midwestern Sports Medicine & Orthopaedic Surgical Specialists, Ltd. ("Midwestern"), alleging claims of hostile work environment sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-1 *et seq*. The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. Before the court are Midwestern's motion to strike Plaintiff's Local Rule 56.1(b)(3) Response and Counterstatement to Defendant's Local Rule 56.1(a)(3) Statement of Material Facts and motion for summary judgment. For the reasons stated below, the court denies Midwestern's motion to strike [#31] but grants its motion for summary judgment [#19].

## I. SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the

proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## II. MIDWESTERN'S MOTION TO STRIKE

### A. Case's Failure to File Timely Her Local Rule 56.1 Response and Counterstatement

Judge Kocoras entered an order on August 11, 2005 directing the parties to file dispositive motions by September 26, 2005 and responses by October 17, 2005. Case filed her response brief and Local Rule 56.1(b)(3)(B) Response and Counterstatement on October 18, 2005, the day after they were due, but did not seek the court's leave to do so, file a motion for an extension of time, *see* Fed. R. Civ. P. 6(b), or otherwise explain the tardy filing. As a result, it is within the court's discretion to refuse to consider Case's Local Rule 56.1 Response and Counterstatement. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse Wisconsin, Inc.*, 991

F.2d 1249, 1257 (7th Cir. 1993) ("[A] decision to disregard all materials submitted after a reasonable filing deadline is certainly not an abuse of discretion because it allows the district court to preserve the moving party's right to respond to the resisting party's argument and to decide the summary judgment motion in a timely fashion.") (internal quotations and citation omitted). *See also Spears v. City of Indianapolis*, 74 F.3d 153 (7th Cir. 1996) ("Deadlines, in the law business, serve a useful purpose and reasonable adherence to them is to be encouraged.").

In this case, however, the delay of one day did not prejudice Midwestern's ability to reply to Case's response nor did it cause a substantial delay in the resolution of this matter. The court also granted Case leave to file a second amended memorandum of law after she submitted her tardy Response brief and Local Rule 56.1(b)(3)(B) Response and Counterstatement. The court would not have granted leave for what would have constituted an exercise in futility if it had intended to disregard Case's Local Rule 56.1(b)(3)(B) materials. Accordingly, the court denies Midwestern's motion to strike as untimely Case's Local Rule 56.1(b)(3)(B) Response and Counterstatement.

**B.   Local Rule 56.1**

Midwestern also has moved to strike Case's Local Rule 56.1(b)(3)(B) Response and Counterstatement for failing to comply with Local Rule 56.1. Midwestern's objections are well-taken. If the court were to rule on the merits of Midwestern's motion, the court would strike the vast majority of Case's responses, resulting in her admission of the corresponding paragraph in Midwestern's Local Rule 56.1 Statement.

In particular, Case failed to refer to any evidence contradicting the asserted facts or her citations to purportedly contradicting evidence failed to contradict the asserted statements contained in paragraphs 11, 16, 19, 21, 22, 23, 24, 26, 34, 41, 42, 43, 44, 50, 56, 57, 60, 62, 69, 73, 77, 78, 82,

3

83, 86, 87, 88, 89, 90, 91, 92, 94, 96, 99, 100, 101, 102, 105, 107, 109, 118, 122, 123, 124, 125, 126, 127, and 128 of Midwestern's Local Rule 56.1 Statement. *See* L.R. 56.1(b)(3)(A); *McGuire v. United Postal Serv.*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission."). Thus, the court would strike Case's responses and, to the extent that Midwestern's statement of facts are supported by their citations to the record, the court would deem those facts admitted. Likewise, Case failed to make specific reference to the affidavits or parts of the record in her responses to paragraphs 9, 10, 12, 13, 14, 15, and 20. The court also would strike Case's response to paragraph 69 of Midwestern's Local Rule 56.1 Statement of Facts. She cites to the affidavit of Lydia Tarsius, which was not attached as an exhibit or otherwise made a part of the record. Accordingly, there is no support for her denial of paragraph 69. Additionally, Case raised relevance objections or other legal arguments without admitting or denying Midwestern's asserted facts in her responses to paragraphs 28, 29, 30, 31, 32, 36, 38, 39, 40, 42, 43, 44, 45, 46, 47, 48, 55, 58, 59, 61, 63, 64, 68, 69, 70, 71, 72, 76, 84, 106, 108, 109, 110, 111, 115, 116, 117, and 129 of Midwestern's Local Rule 56.1 Statement of Facts. *Cady v. Miss Paige, Ltd.*, No. 02 C 4867, 2004 U.S. Dist. LEXIS 7613, 2004 WL 1144044 (N.D. Ill. Apr. 30, 2004) ("Local Rule 56.1 . . . emphasizes that it is inappropriate to include legal conclusions and/or argument in the Rule 56.1 statements of fact."). The court, therefore, would strike Case's responses and deem those facts admitted to the extent that they are supported by their citations to the record.

In this case, however, the court declines to exercise its discretion to enforce Local Rule 56.1 strictly. *See Little v. Cox's Supermarket*, 71 F.3d 637 at 641 (7th Cir. 1995) ("It is clear that the decision whether to apply the rule strictly or overlook any transgression is one left to the court's

discretion."), citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 at 923 (7th Cir. 1994). As the Seventh Circuit has stated repeatedly, "A local rule of a federal district court is written by and for judges to deal with special problems of their court, and we are disposed therefore to give a district judge's interpretation of [her] court's local rules . . . considerable weight." *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803 at 810 (7th Cir. 2005) (citations omitted). While many, if not most, of Case's responses do not comply with the clear instructions of Local Rule 56.1(b), Case's Local Rule 56.1(b) Response and Local Rule 56.1(b)(3)(B) Counterstatement of Fact sufficiently identify her disputes with the facts asserted. The court, therefore, denies Midwestern's motion to strike.

## III. FACTS

### A. Background

From September 12, 2000 to March 20, 2003, Case worked as a billing supervisor for Midwestern. (Defendant Midwestern Sports Medicine & Orthopaedic Surgical Specialists, Ltd.'s Local Rule 56.1(a) Statement of Uncontested Material Facts ¶ 2, hereinafter "DSF ¶ __") (Plaintiff's Local Rule 56.1(b)(3) Response and Counterstatement To Defendant's Local Rule 56.1(a)(3) Statement of Material Facts ¶ 132, hereinafter "PSF ¶ __"). During her employment at Midwestern, Case reported directly to her supervisor, Steve Maiworm ("Maiworm"), Midwestern's Practice Administrator/Executive Director. (PSF ¶¶ 307, 349, 401). Maiworm, in turn, reported to Dr. Eugene Lopez, the president and primary owner of Midwestern, Dr. Bruce Montella, Dr. Mary Morrell, Dr. Martin Saltzman, and Dr. Daniel Kuesis. (DSF ¶¶ 4, 87). By all accounts, Case was a responsible employee who performed her job duties competently and efficiently. (DSF ¶ 7).

On March 6, 2003, Case resigned her employment with Midwestern by submitting a letter,

5

which stated, "To Whom It May Concern: This letter serves as my resignation from my employment with Midwest Sports Medicine. My final day of employment will be March 20, 2003. Thank you for the opportunities that have been afforded to me in the past two years. Sincerely, Kim Case." (DSF ¶¶ 16, 17; PSF ¶¶ 189, 190). Case's last day of employment with Midwestern was March 20, 2003. (DSF ¶ 7).

### B. Events Giving Rise to Case's Claims

1. Steve Maiworm

According to Case, her employment at Midwestern was marred by a sexually-charged work environment in which her supervisor, Maiworm, frequently grabbed his genitals in front of Case and regularly made derogatory remarks to and about Case, her coworkers, and women generally, referring to them as "sluts," "whores," and "bitches." (PSF ¶¶ 168, 187). Such gestures and remarks were punctuated by Maiworm's requests from Case for sexual favors, comments about other employees' sexual behavior, and comments about Case's sexual relationship with her husband.

In particular, Maiworm told Case in February of 2001 that two of her co-workers had performed "blow jobs" on each other in another co-worker's office because they hated that co-worker so much. (PSF ¶ 160). In July of 2001, Case attended a convention with Maiworm, who engaged in a lengthy conversation about "blow jobs" with two other women in Case's presence. (PSF ¶ 161). A few months later, in October of 2001, Case, Maiworm, and a third co-worker were at a bar when Maiworm, in reference to the co-worker, said to Case, "Look at the way she walks. She is nothing but a fucking whore. She is nothing but a slut." (PSF ¶ 162). Case asked Maiworm if he thought that the co-worker was able to drive because she had been drinking. (PSF ¶ 162). Maiworm responded, "Don't worry about it. She's nothing but a fucking whore, and all she will do

6

if she gets pulled over is tell the cop to hop in the back and give him a blow job." (PSF ¶ 162).

On February 14, 2002, Case arrived late to work and told Maiworm that her battery was dead. (PSF ¶ 169). In response, Maiworm stated, "Don't give me that. You were fucking your husband for Valentine's Day." (PSF ¶ 169). Plaintiff then informed Maiworm, "What I do with my husband is none of your concern. Don't talk to me that way." (PSF ¶ 169). At some point in mid-2002, Maiworm commented to Case that he should "go over there and fuck Mrs. Lopez" because Dr. Lopez was on vacation without his wife. (PSF ¶ 165). In October of 2002, Maiworm radioed Case on her work radio late at night, asking her to come over and give him and his friend a "blow-job." (PSF ¶ 165). In Case's presence, Maiworm and his brother also commented that they wanted to grab their co-worker's breasts. (PSF ¶ 166). Case informed Maiworm that such comments were inappropriate. (PSF ¶ 167).

Case also heard complaints from her co-workers about Maiworms behavior. In October of 2000, two of Case's co-workers complained to her that Maiworm had propositioned them to spend the night with him in his hotel room after a wedding. (PSF ¶ 158). Another employee complained to Case that Maiworm had exposed his penis to her. (PSF ¶ 170). Case confronted Maiworm about this complaint. (PSF ¶ 171).

Case complained to Maiworm more than 20 times about his language and asked him repeatedly to refrain from using such offensive language at work. (PSF ¶ 188). Maiworm never changed his behavior. (PSF ¶ 188). Maiworm, however, denies that Case or any other employee complained to him that Case considered his language offensive, denies that any of the above comments or incidents occurred, denies that he subjected Case or any other female employee to verbal abuse, and denies that he ever requested sexual favors from any employee at Midwestern

7

while he was employed there. (DSF ¶¶ 96, 97, 98).

2. Dr. Lopez

Case also found certain conduct of Dr. Lopez offensive. At the company Christmas party in December of 2001, Dr. Lopez pulled his trousers down to show off his underwear.[1] (PSF ¶¶ 163, 222). In mid-2002, Dr. Lopez was talking loudly and laughing in a telephone conversation with his urologist on the telephone. (DSF ¶ 54; PSF ¶ 149). The telephone was located in the hallway across from Case's office. (PSF ¶ 149). Case heard Dr. Lopez say, "Yeah, I just had a vasectomy yesterday and my balls are hanging low and I'm walking very gingerly." (PSF ¶ 149).

3. Events Leading Up to Case's Resignation

On February 13, 2003, Case discovered a classified ad that someone had placed on her desk. (PSF ¶ 179). Case began to experience chest pains. (PSF ¶ 179). She telephoned and left a message for Maiworm, informing him that she needed a two-week medical leave. (PSF ¶ 179). Case took a two-week medical leave. (PSF ¶ 157). While Case was on medical leave, Cathy Hemaur, informed Case that she had discovered several classified ads on Case's desk and had thrown them in the garbage. (PSF ¶ 157).

While working from home on February 24, 2003, Case discovered that she was locked out of her computer. (PSF ¶ 180). As a result, Case was unable to perform her work. (PSF ¶ 180). Maiworm left a message for Case in which he told her that her password had been changed and that

---

[1]There is some dispute as to what precisely Dr. Lopez was wearing under his trousers and the manner in which Dr. Lopez displayed his apparel. Dr. Lopez testified that he was wearing shorts with pockets. Case has contended to the contrary that they were underwear and, more specifically, boxer shorts. Additionally, defendants assert that Dr. Lopez did not pull down his trousers but rather unbuttoned his trousers to reveal his shorts. (DSF ¶ 60). Case avers that he pulled his trousers down. (PSF ¶ 163). Case's citation to the record supports the proposition that Dr. Lopez was wearing underwear and that Dr. Lopez pulled his trousers down. Taking the facts in the light most favorable to Case, Dr. Lopez pulled down his trousers to show his underwear.

8

she was locked out of her computer. (PSF ¶ 181). The next day, February 25, Case telephoned Maiworm from her telephone number but he did not answer his telephone. (PSF ¶ 182). Case then blocked her telephone number and immediately telephoned Maiworm. (PSF ¶ 182). Maiworm answered his telephone and asked Case, "Are you quitting?" (PSF ¶ 182). Case replied, "No. It looks like you are firing me." (PSF ¶ 182).

On March 3, 2003, her first day back at work after her medical leave of absence, Case discovered a classified ad for an exotic dancer on her desk. (PSF ¶ 183). Case went to Dr. Lopez and complained about the ad. (PSF ¶ 139). Dr. Lopez laughed and said, "Well, you're in management. It's just a disgruntled co-worker." (PSF ¶ 140). Case responded, "This isn't funny. This is not something that should be happening in an office." (PSF ¶ 141). Dr. Lopez said that he would talk to Maiworm about the ad. (PSF ¶ 141).

Dr. Lopez went to Maiworm's office and asked him if he knew who had placed the classified ad on Case's desk. (PSF ¶ 144). Maiworm said that he did not know anything about the ads. (PSF ¶ 144). Dr. Lopez then called Case into Maiworm's office and said, "Kim, we don't know who did this." (PSF ¶ 145). Both Dr. Lopez and Maiworm were laughing. (PSF ¶ 145). Case said, "I don't think this is funny. This is humiliating, and I feel tormented. It's wrong, and it's sexual harassment." (PSF ¶ 145). Dr. Lopez replied, "Oh Kim, you're a good manager. You're doing a good job. It's just somebody that's upset." (PSF ¶ 146). Case responded, "No, this is wrong[,] and something needs to be done about it." (PSF ¶ 147). Dr. Lopez then joked to Maiworm, "I'll be like Sadaam Hussein and we'll find out who was responsible." (PSF ¶ 148).

Maiworm inquired around the office about who had placed the ad on Case's desk but did not find out who had done so. (DSF ¶ 13). Maiworm also advised Midwestern's employees that such

9

conduct was unacceptable. (DSF ¶ 14).

Case submitted her letter of resignation to Dr. Lopez on March 6, 2003. (PSF ¶ 189). Dr. Lopez came to Case and told her that he was sorry that she was leaving. (PSF ¶ 191). Case responded, "Dr. Lopez, there's a lot of things that are going on in the office, sexually, hostility, it's a terrible environment, and you are the one that will be held responsible because you are the owner of the company." (PSF ¶ 192). Dr. Lopez then threw his arms up in the air and said, "You don't have to tell me about this. I already know about it." (PSF ¶ 192).

After submitting her letter of resignation, Maiworm called a meeting with the billing department to inform them that Case was leaving Midwestern. (PSF ¶ 137). At the end of the meeting, Maiworm said, "Dr. Lopez knows about the ads, so don't put them on Kim's desk anymore." Then Maiworm laughed. Maiworm denies that he was involved in or knew of anyone placing ads on Case's desk. (DSF ¶ 20).[2]

### C. Employer Liability

1. Employee Handbook

Midwestern has a written policy against sexual harassment, which requires that all employees who are aware of harassment report it immediately to administration. (DSF ¶¶ 122, 126). The policy also requires any employee who feels that they have experienced harassment to report the incident immediately to a member of administration. (DSF ¶ 126). At office meetings, Midwestern's employees also were instructed that they were to go to their immediate supervisor if they were

---

[2] Case offered the hearsay testimony of Maiworm's former girlfriend, Rhonda Pierce ("Pierce") that Maiworm told her that Case was probably going to quit or resign from her employment "because we've been putting classified ads on her desk and she's very upset about it." (PSF ¶ 211). Pierce asked Maiworm to clarify, and Maiworm said that they had been placing classified ads on Case's desk for "Heavenly Bodies" topless dancers. (PSF ¶ 212). Case has not argued that she was offering this statement for any other purpose than its truth-value. As such, the court will disregard it when deciding whether a genuine issue of material fact exists.

having problems with a co-worker. (DSF ¶ 129). If the immediate supervisor did not handle the situation, they could go to any supervisor. (DSF ¶ 129). No one at Midwestern reviewed the sexual harassment policy with the employees or conducted any seminars or classes explaining sexual harassment. (PSF ¶¶ 468, 503).

Although Dr. Lopez avers that employees could always go to him with complaints about anything and that he did not tell Maiworm or any other employee that he was not to be approached with complaints (DSF ¶¶ 95, 127-28), Dawn Drews ("Drews"), has stated that Maiworm sent a memo to all employees indicating that no one was to approach Dr. Lopez with any problems and that they were to go to Maiworm. (PSF ¶¶ 266, 277). Maiworm denies that he ever told employees that they were not to approach Dr. Lopez with complaints. (DSF ¶ 94).

### D. Present Litigation

Case filed a *pro se* complaint with the Equal Employment Opportunity Commission ("EEOC") on September 30, 2003 in which she alleged claims of sexual harassment against the practice administrator. The EEOC issued a right to sue letter to Case on February 27, 2004. Case filed her complaint in this court on May 26, 2004.

### IV. ANALYSIS

#### A. Statute of Limitations

Before determining whether a genuine issue of material fact exists with regard to Case's hostile work environment and constructive discharge claims, the court must determine whether certain claims are time-barred by the statute of limitations. As recognized by Midwestern, Title VII requires that plaintiffs file a charge of discrimination with the EEOC no later than 300 days after the alleged violation occurred. 42 U.S.C. § 2000e-5(e); *Conrad v. City of Chicago*, 954 F. Supp. 180,

11

181 (N.D. Ill. 1997). Because Case did not file her EEOC charge until September 30, 2003, Midwestern argues that all claims relating to incidents occurring prior to December 4, 2002 are time-barred. Case argues to the contrary that her claims are not barred by the statute of limitations because the claims are part of one unlawful employment practice, namely, a hostile work environment.

In *National Railroad Passenger Corporation* v. *Morgan*, 536 U.S. 101, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002), the Supreme Court distinguished hostile work environment claims from those involving discrete acts:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative affect of individual acts.

536 U.S. at 115 (internal citations omitted). The Court then concluded with regard to filing timely hostile work environment claims, "Given, therefore, that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118. Therefore, this court must determine whether the acts about which Case complains are part of the same hostile work environment practice, and, if so, whether any of these acts falls within the statutory time period. *Id.* at 117.

Midwestern correctly argues that Case must link those acts occurring before December 4, 2002 with those acts that occurred within the 300-day limitations period. *See Morgan*, 536 U.S. at

118 (noting that acts outside limitations period must relate to acts that occurred within the limitations period). Unfortunately for Case, she has not demonstrated a connection between the pre- and post-December 4, 2002 acts.

Taking the facts in the light most favorable to Case, during her employment with Midwestern, Maiworm, her supervisor, subjected her to vulgar remarks and verbal conduct of a sexual nature. Maiworm referred to women as "sluts," "whores," and "bitches" in Case's presence. He requested sexual favors from Case on one occasion. He made comments to Case about her sexual relationship with her husband on one occasion. He discussed his sexual desire for his co-workers with Case. He commented on other employees' sexual behavior. He grabbed his genitals in front of Case. Additionally, other employees complained to Case about Maiworm's inappropriate behavior, including exposing his penis to a co-worker and propositioning his co-workers to spend the night with him. Even if such facts are true, Case has not offered evidence that establishes that this conduct continued or that this conduct related to the incidents that occurred after December 4, 2002.

During her deposition, Case stated that, in the few months prior to her resignation, Maiworm directed increasingly hostile and vulgar language to her on a more frequent basis, specifying that he spoke of "blow jobs" and referred to women as "sluts," "whore," and "bitches." Case, however, failed to offer specific, concrete facts or details about when these comments were made, what exactly was said, how this language was directed at her, how it was any more vulgar than the language Maiworm had used previously, or how much more frequently Maiworm used such language, which is in sharp contrast to her discussion of specific statements and conversations with Maiworm that occurred prior to December 4, 2002. Case's conclusional statements that Maiworm directed

13

increasingly hostile and vulgar language to her on a more frequent basis, ungrounded in specific facts, are insufficient to withstand summary judgment. *See Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002) (nonmovant must present definite, concrete evidence in rebuttal to defeat a summary judgment motion). As such, the court will disregard Case's conclusional statements in deciding whether a genuine issue of material fact exists.[3]

Case also has not demonstrated that the incidents involving Dr. Lopez were related to the incidents that occurred after December 4, 2002, *i.e.*, the placement of the classified ads on Case's desk or Case's being locked out of her computer. Accordingly, the court will not consider such incidents in its analysis.

### B. Hostile Work Environment Sexual Harassment and Constructive Discharge

In order to succeed on a claim of hostile work environment based on sexual harassment, Case must establish that "(1) she was subject to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the terms and conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675 at 677 (7th Cir. 2005), citing *Cooper-Schut v. Visteon Auto Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). The work environment also must be both objective and subjectively offensive, *i.e.*, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775 at 787, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).

---

[3]Case's averment that Maiworm directed increasingly hostile and vulgar language to her on a more frequent basis also contradicts her testimony that her notes and responses to interrogatories, which fail to mention Maiworm's direction of any increasingly hostile and vulgar language to Case on a more frequent basis, contain all of the incidents which Case believed were significant to her claims in this lawsuit. *See* DSF ¶ 50.

To determine whether a hostile work environment exists, the court considers the totality of the circumstances, including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trs. of Univ. of Ill.*, 243 F.3d 336, 343 (7th Cir. 2001) (internal quotations and citations omitted). The Seventh Circuit has counseled that "isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). Likewise, "[t]he occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create an objectively hostile work environment. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). The evidence offered by Case in support of her hostile work environment claim consists of the placement of classified ads on her desk and being locked out of her computer. This evidence is insufficient to establish the existence of a hostile work environment claim for several reasons.

First, Case has not offered any evidence or argument connecting the computer lock-out incident to her gender.[4] Title VII only prohibits discrimination because of an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). It does not prohibit every instance of workplace harassment or every employment-related decision made by an employer that an employee does not like. Moreover, the evidence suggests that, at most, the computer lock-out was a temporary inconvenience that occurred over the course of a single day while Case was out of the office on

---

[4] The court notes that Midwestern offered evidence in its Response to Case's Counterstatement of Facts that Rosemary Martin locked Case out of her computer because Case had mass released thousands of insurance claims, which caused a difficult situation for employees in Midwestern's billing department. Martin deleted Case's password from the computer system in order to stop this process. This incident occurred primarily in the evening hours and overnight. Case's computer access was reinstated the following morning. *See* Defendant's Exhibit DD, Affidavit of Rosemary Martin.

15

medical leave.

Second, in her Local Rule 56.1(b)(3)(B) Counterstatement of Facts, Case refers repeatedly to the placement of sexually-explicit classified ads on her desk. *See* PSF ¶¶ 135, 154, 155. The cited evidence, Case's deposition testimony, only supports the assertion that one classified ad was sexual in nature.[5] Case has not offered any evidence or argument that would suggest that the placement of a classified advertisement that makes no reference to sex or a sex-related profession contributes to a hostile work environment based on sexual harassment.

Third, even if the court were to consider Maiworm's continued use of vulgar language after December 4, 2002, including discussions of "blow jobs" and the use of the terms "sluts," "whores," and "bitches," such language and comments "are more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." *Racicot*, 414 F.3d at 678, citing *Cooper-Schut*, 361 F.3d at 426. Case's averment that Maiworm's used increasingly vulgar language also fails to specify how this language was directed at her, how it was any more vulgar than the language Maiworm used previously, or how much more frequently he used such language.

Fourth, important to the court's consideration of Case's hostile work environment claim is what did not occur. *See Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997)

---

[5] This is not the only instance in which Case attempts to stretch the evidence to bolster her claims. For example, Case states, "Plaintiff was subjected to vulgar, offensive and sexual language on a daily basis for nearly three years while working at Midwestern." *See* Plaintiff's Second Amended Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 5. The cited evidence fails to come even close to establishing that Case was subjected to foul language on a daily basis for three years. Instead, the cited evidence discusses the specific instances of foul language and inappropriate behavior that occurred prior to December 4, 2002 and the general statement that Maiworm constantly referred to women as "sluts," "whores," and "bitches." Additionally, Case attempts to draw a causal connection from her chest pains to the stress she was under at work and the placement of a classified ad on her desk, but her testimony is not sufficient to do so. *See* PSF ¶¶ 178, 179. In the absence of competent, medical evidence, Case's conclusional assertions are insufficient to establish as fact that her chest pains and need for a medical leave of absence were due to her job-related stress and the placement of the classified ad on her desk.

(finding "it important to take into account what [the defendant] did *not* do" in rejecting hostile work environment claim, including not touching the plaintiff, not propositioning her for sex, not threatening her, not exposing himself, not showing her dirty pictures, nor ever saying "anything to her that could not be repeated on prime-time television). Here, Case was not touched or physically threatened. Maiworm never exposed himself to Case. Maiworm never showed Case dirty pictures. Although Maiworm requested sexual favors from Case on one occasion and commented on her sexual relationship with her husband on one occasion, such incidents occurred well before her resignation, and there was no evidence that Case continued to request sexual favors or comment on Case's relationship with her husband.

The conduct about which Case complains, while certainly distasteful, was not illegal. As the Seventh Circuit has explained, "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville*, 50 F.3d at 431. *See also Patt* v. *Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (plaintiff's complaint of eight gender-related comments during the course of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina" was insufficient to demonstrate hostile work environment). Maiworm's conduct was vulgar, boorish, and unprofessional but not so "frequent, humiliating, or threatening as to create a claim of hostile work environment." *Whittaker* v. *N. Ill. Univ.*, 424 F.3d at 646 (7th Cir. 2005). Taken as a whole, the isolated incidents of inappropriate behavior and the placement of a classified ad for an exotic dancer on Case's desk fail to demonstrate the existence of an objectively hostile work environment. Accordingly, the court grants Midwestern's motion for summary judgment on Case's hostile work environment claim.

The court also concludes that Case has failed to demonstrate that she was constructively

discharged from her employment at Midwestern. In order to establish a constructive discharge, Case must establish that the "harassing behavior [was] sufficiently severe or pervasive to alter the conditions of her employment" and that "the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Levenstein* v. *Salafsky*, 414 F.3d 767 at 774(7th Cir. 2005), quoting *Pennsylvania State Police* v. *Suders*, 542 U.S. 129 at 141, 159 L. Ed. 2d 204, 124 S. Ct. 2342 (2004). Because the court has determined already that Case cannot satisfy the first inquiry for purposes of her hostile work environment claim, Case cannot establish that she was constructively discharged. The court, therefore, grants Midwestern's motion for summary judgment on Case's constructive discharge claim.

## ORDER

For the reasons stated above, the court denies Midwestern's motion to strike [#31] but grants its motion for summary judgment [#19]. All future dates are stricken. This case is terminated.

ENTER: *(signature)*

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: December 15, 2005

18